UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DUANE MILLER

                Plaintiff,

        v.                                    **REPORT AND RECOMMENDATION**
                                                **07-CV-1093 (LEK)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

                Defendant,

## I.    Introduction

Plaintiff Duane Miller Jr., brings this action pursuant to the Social Security Act
("the Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of a final decision of the
Commissioner of Social Security ("Commissioner"), denying his application for child's
insurance benefits ("CIB") and Supplemental Security Income ("SSI").[2] Specifically,
Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") denying his
applications for benefits during the period at issue was not supported by substantial
evidence and was contrary to the applicable legal standards. The Commissioner argues
that the decision was supported by substantial evidence and made in accordance with
the correct legal standards.

For the reasons set forth below, the Court finds the Commissioner's decision is
supported by substantial evidence and determined in accordance with the applicable
law. Therefore, the Court recommends that the Plaintiff's motion for judgment on the

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to
Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.
[2] This case was referred to the undersigned for Report and Recommendation, by the Honorable Norman
A. Mordue, pursuant 28 U.S.C. § 636(b)(1)(B), by an Order dated May 8, 2009.

pleadings be denied and Defendant's cross-motion for judgment on the pleadings be granted.[3]

## II.    Background

On May 23, 2005, Plaintiff, then 21 years old, filed an application for SSI and CIB, claiming disability since June 18, 1992, because of epilepsy and a learning disability (R. at 72, 75).[4] His application was denied initially on January 13, 2006 (R. at 22-26). Plaintiff filed a timely request for a hearing on January 27, 2006 (R. at 29).

On , Plaintiff and his attorney appeared before the ALJ (R. at  ).The ALJ considered the case *de novo* and, on April 21, 2007, issued a decision finding Plaintiff was not disabled (R. at 10-21). The ALJ's decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review on September 6, 2007 (R. at 6-9). On October 17, 2007, Plaintiff filed this action.

Based on the entire record, the Court recommends the Commissioner's decision be upheld because the decision is supported by substantial evidence in the record.

## III.    Discussion

### A.  Legal Standard and Scope of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383 (c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were

---

[3] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings . . . ." General Order No. 18. (N.D.N.Y. Sept. 12, 2003).
[4] Citations to the underlying administrative record are designated as "R."

not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).   "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."

Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation[5] process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 416.920, 404.1520.

In addition to showing a disability under the five-step sequential analysis, a claimant seeking CIB must demonstrate his disability began before age 22. 20 C.F.R. § 404.350(a)(5). To be entitled to CIB a claimant must also be an insured's person's child, be dependent on the insured, apply for benefits, and be unmarried. 20 C.F.R. § 404.350(a).

### B. Analysis

#### 1.    The Commissioner's Decision

The ALJ first concluded that as of January 9, 2006 Plaintiff was an unmarried, dependent of an insured (R. at 15). The ALJ noted that Plaintiff did not work from his alleged onset date of June 18, 1992 through April 2002, and at various times thereafter

---

[5] First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

(R. at 15-16). Plaintiff did not work during the entire period under consideration (R. at 16). At step two, the ALJ concluded that Plaintiff's borderline intellectual functioning was a severe impairment, but his seizure disorder and depression were not severe impairments (R. at 16-18). At step three, the ALJ considered whether Plaintiff met Listing 12.05(C), and concluded that Plaintiff did not meet the diagnostic description requirements, had valid IQ scores above 70, and had no other severe impairment (R. at 18). At step four, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform work in a range between unskilled work to the lower end of semi-skilled work, requiring simple tasks and some complex tasks, at any exertional level (R. at 18-20). Finally, the ALJ concluded that Plaintiff could perform his past work as a cemetery caretaker as it was actually performed or as it is generally performed (R. at 20). Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (R. at 21).

## 2.      The Plaintiff's Claims

Plaintiff generally argues that the ALJ did not properly consider whether Plaintiff met or equaled Listing 12.05(C). Specifically, Plaintiff argues that (a) the ALJ did not properly consider or reconcile Plaintiff's 1999 and 2005 IQ scores; (b) his 1999 IQ scores met the first prong of Listing 12.05(C); (c) Plaintiff met the second prong of Listing 12.05(C) because his seizure disorder and depression were severe impairments; and (d) even if Plaintiff did not meet Listing 12.05(C), the ALJ was required to determine if Plaintiff equaled the Listing. Plaintiff's Brief, pp. 2-4.

Because Plaintiff's arguments rely exclusively on Listing 12.05(C), the Court will set forth its controlling requirements and the relevant facts. Impairments listed in

Appendix 1 of the regulations are "acknowledged by the [Commissioner] to be of

sufficient severity to preclude" substantial gainful activity; therefore, a claimant who

meets or equals a Listing is "conclusively presumed to be disabled and entitled to

benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); see 20 C.F.R. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii) ("If you have an impairment(s) that meets or equals

one of our listings in appendix 1 of this subpart and meets the duration requirement, we

will find that you are disabled.").

> Listing 12.05 and criteria (C) state:
>
>> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>> . . . .
>> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.05, 12.05(C) (2009). To meet Listing

12.05(C), a claimant must satisfy the diagnostic description in the introductory

paragraph of 12.05, and both prongs of section (C). See 20 C.F.R. Pt. 404, Subpt. P,

App. 1, § 12.00(A) ("If your impairment satisfies the diagnostic description in the

introductory paragraph and any one of the four sets of criteria, [the Commissioner] will

find that your impairment meets [Listing 12.05].").Thus, to meet Listing 12.05(C),

Plaintiff must show: (1) significantly subaverage general intellectual functioning with

deficits in adaptive functioning initially manifested before age 22; (2) a valid IQ score of

60 through 70; and (3) another severe physical or mental impairment. Furthermore, the regulations specify that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, [the Commissioner] use[s] the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(c).

In this case, the record shows that Plaintiff has two sets of IQ scores: one from 1999 and one from 2005. On June 21, 1999, consultative examining psychologist, Stephen S. Tien, Ph.D., conducted an intellectual evaluation of Plaintiff, who was then 15 years old (R. at 234-36). Plaintiff completed the Wechsler Intelligence Scale for Children-III ("WISC-III") with the following results: a verbal IQ score of 67, a performance IQ score of 71, and a full scale IQ score of 67 (R. at 235). Dr. Tien opined that Plaintiff's evaluation was "a valid and reliable estimate of [Plaintiff's] current functioning, however, he may be suffering from depression, which may lower his scores." Id. The 1999 intelligence evaluation was not an exhibit in the record originally before the ALJ. Instead, it appears in the record as an exhibit provided to the Appeals Council by Plaintiff's attorney (R. at 234-39). In a letter accompanying the 1999 report and dated April 25, 2007, Plaintiff's attorney explained to the Appeals Council that the evaluation had been in the record when he photocopied the evidence for his case preparation, but if it was no longer in the record he was submitting it as new evidence (R. at 237). However, the record discloses that although the 1999 intellectual evaluation was apparently not in the record before the ALJ, the relevant scores were in the record before the ALJ. Indeed, on January 9, 2007, two months before Plaintiff's hearing, Plaintiff's attorney wrote to the ALJ and restated Plaintiff's 1999 IQ scores (R. at 124). A

7

second intellectual evaluation was conducted on July 21, 2005, by consultative examining psychologist Dennis M. Noia, Ph.D. (R. at 145-49). Plaintiff completed the Wechsler Adult Intelligence Scale-III ("WAIS-III") with the following results: a verbal IQ score of 77, a performance IQ score of 72, and a full scale IQ score of 72 (R. at 147). Dr. Noia opined that Plaintiff's evaluation was a "valid and a reliable estimate of current functioning." Id.

### a.  The ALJ Did Not Explain Why Plaintiff's 2005 IQ Scores Were Preferred Over His 1999 IQ Scores

Plaintiff argues:

> [The] ALJ has to find some way to reconcile the scores and at a minimum at least has to consider both results. [The] ALJ in the entire decision makes no attempt to reconcile the two different IQ testing results and does not even recognize, comment upon or consider the earlier IQ test showing two of three IQ's below 70. The failure to even consider medical evidence is clear error. 20 C.F.R. Section 404.1527(b) specifically provides that the Administration and the Administrative Law Judge is required to evaluate and explain the weight given to all medical evidence.

Plaintiff's Brief, p. 2.

The Court interprets Plaintiff to be arguing (i) the ALJ erred by not considering Plaintiff's 1999 IQ scores; and (ii) 20 C.F.R. § 404.1527(b) required the ALJ to evaluate and explain the weight she assigned to the 1999 IQ scores; and (iii) the ALJ should have at least explained how she reconciled the conflicting IQ scores, to which Defendant counters that the ALJ properly relied on the 2005 IQ scores. Defendant's Brief, p. 6-7.

### i.   The ALJ Considered Plaintiff's 1999 IQ Scores

An ALJ must "consider all evidence in [a claimant's] case record." 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). And, the ALJ must set forth "the crucial factors in any determination . . . with sufficient specificity to enable [the court] to decide whether the

8

determination is supported by substantial evidence." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) (internal citations omitted). However, '[t]he ALJ [is] not required to mention or discuss every single piece of evidence in the record." <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F.Supp.2d 67, 78 (N.D.N.Y. 2005); <u>see</u> <u>Ferraris</u>, 728 F.2d at 587 ("[The Second Circuit does] not suggest that every conflict in a record must be reconciled by the ALJ . . ."). Although courts will remand when they are "unable to fathom the ALJ's rationale in relation to evidence in the record," <u>Berry v. Schweiker</u>, 675 F.2d 464, 469 (2d Cir. 1982), "[w]hen . . . the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to] have mentioned every item of testimony . . . or . . . evidence . . ." <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1040 (2d Cir. 1983).

In this case, the ALJ discussed Plaintiff's IQ scores as follows:

> Even so, the undersigned has considered Counsel's argument that Listing 12.05C is met due to evidence of a valid verbal, performance, or full scale I.Q. of 60 through 70. The IQ scores the claimant received when tested by Dr. Noia in July 2005 were all above 70, and Dr. Noia regarded these scores as valid and reliable estimate of the claimant's functioning (Exhibit 3F). There is no provision in the regulations for averaging IQ test results from different years, as urged by the claimant's representative (Exhibit 11E).

(R. at 18). Thus, the ALJ clearly "considered" evidence of an IQ score "of 60 through 70." She cited to "Exhibit 11E," which contained Plaintiff's 1999 IQ scores.[6] She rejected Plaintiff's suggestion that she average his earlier IQ scores with the later ones. And, she employed Dr. Noia's finding that Plaintiff's 2005 scores were "valid and reliable." Based on the ALJ's decision, the Court can only conclude that the ALJ unquestionably

---

[6] Exhibit 11E is the April 25, 2007 letter from Plaintiff's attorney to the ALJ which restates Plaintiff's 1999 IQ scores (R. at 124-26).

considered Plaintiff's 1999 IQ scores. Despite considering Plaintiff's 1999 scores, the ALJ accepted and relied upon his 2005 IQ scores. Thus, Plaintiff's argument that the ALJ erred in failing to consider Plaintiff's 1999 IQ scores is unavailing.

### ii.    20 C.F.R. § 404.1527(b) Does Not Require an ALJ to Assign Weight to IQ Tests

If Plaintiff was relying on 20 C.F.R. § 404.1527(b) to argue that the ALJ had to assign weight to Plaintiff's IQ test scores, such reliance was misplaced. The Court notes that 20 C.F.R. § 404.1527(b) applies to the evaluation of medical opinions. Section 404.1527(b) states: "(b) How we consider medical opinions. In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). "Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of . . . impairment(s), including . . . symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and . . . physical or mental restrictions." § 404.1527(a)(2). By their very nature, IQ results are not statements from doctors, reflecting their judgment; instead IQ scores result from a claimant's performance on a standardized test. See Merriam-Webster Online Dictionary, IQ Definition, http://www.merriam-webster.com/dictionary/IQ (last visited June 5, 2009) (defining IQ as "a number used to express the apparent relative intelligence of a person . . . a score determined by one's performance on a standardized intelligence test relative to the average performance of others of the same age"). Thus, IQ scores are more properly considered "laboratory findings" resulting from diagnostic techniques, and not medical opinions. See 20 C.F.R.

§ 404.1528 ("Laboratory findings are anatomical, physiological, or psychological

phenomena which can be shown by the use of a medically acceptable laboratory

diagnostic techniques. Some of these diagnostic techniques include chemical tests,

electrophysiological studies (electrocardiogram, electroencephalogram, etc.),

roentgenological studies (X-rays), and psychological tests."). Therefore the Court

concludes that the ALJ was not required to assign weight to Plaintiff's IQ scores and

therefore did not err in failing to do so.

### iii.   The ALJ Was Not Required to Explain How She Reconciled the IQ Scores

Defendant argues the ALJ properly relied on the 2005 IQ scores because the

1999 scores were invalid based upon the language in childhood Listing 112.00(D).

Defendant's Brief, p. 6-7. Defendant relies on a portion of Appendix 1 which describes

*per se* disability requirements for individuals under the age of 18. Defendant's Brief, p.

6.  Defendant quotes the following:

> IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00(D)(10).

Thus, Defendant argues that the 1999 IQ scores were invalid as a matter of law.

As such, Defendant contends, the ALJ properly relied upon the 2005 IQ scores.

However, while it is clear the ALJ considered Plaintiff's 1999 IQ scores and did not find

those scores controlling, it is not clear why she rejected them and found the 2005 IQ scores determinative.

This Court is reluctant to entertain Defendant's argument, which appears to be a *post hoc* rationalization for the ALJ's action. Snell v. Apfel , 177 F.3d 128, 134 (2d Cir. 1999) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)); see also Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) ("Nor may [the Court] properly affirm an administrative action on grounds different from those considered by the agency") (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)); Velardo v. Astrue, No. 07-1604, 2009 WL 229777, at *11 (W.D. Pa. Jan. 29, 2009) (rejecting the same argument on the same grounds).

Further, although the Courts of Appeals have generally concluded that an ALJ may reject an IQ score as invalid when it is inconsistent with the record,[7] courts have reached different conclusions regarding how the ALJ should treat varying IQ scores

---

[7] Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007) (citing Markle v. Barnhart, 324 F.3d 182, 186 (3d Cir. 2003); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998); Muse v. Sullivan, 925 F.2d 785, 790 (5th Cir. 1991); Lowery v. Sullivan, 979 F.2d 835, 837-39 (11th Cir.1992)) ("We conclude that it was proper for the ALJ to consider other evidence in the record when determining whether Lax's IQ scores were valid and that the record contains substantial evidence to support a finding that Lax's IQ scores were not an accurate reflection of his intellectual capabilities."); see also Clay v. Barnhart, 417 F.3d 922, 929-31 (8th Cir. 2005) (upholding the ALJ's rejection of two sets of IQ scores where the test administrator considered the first set invalid and the report on the second set was sufficiently equivocal as to its validity to allow the ALJ to disregard its conclusions); Brown v. Sec'y of Health & Human Servs., 948 F.2d 268 (6th Cir. 1991) (holding that the district court's conclusion that Plaintiff's IQ score was invalid was unsupported by substantial evidence, but not questioning the fact-finder's role in determining the validity of IQ scores); Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986) (finding the ALJ's rejection of the Plaintiff's low IQ scores proper where the Plaintiff was close to completing a bachelor's degree and had taught high school algebra); Vazquez ex rel. Jorge v. Barnhart, 2005 WL 2429488, at *8 (S.D.N.Y. Sept. 30, 2005) ("As Jorge has multiple IQ scores both below and above 70, it is for the ALJ to reconcile these scores."); Vasquez-Ortiz v. Apfel, 48 F.Supp.2d 250, 257 (W.D.N.Y. 1999) (stating that "an ALJ is not required to accept a claimant's IQ scores when they are inconsistent with the record" but finding the Plaintiff's scores were not inconsistent with the record) (quoting Popp, 779 F.2d at 1499-1500).

when all are considered valid. Compare Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001) (remanding "for further analysis to resolve the twenty-five point discrepancy between Muncy's two IQ scores" and directing the Commissioner to "enter specific findings detailing why Muncy's first IQ score should not be adopted as the controlling score"); with Nieves v. Sec'y of Health & Human Servs., 775 F.2d 12, 14 (1st Cir. 1985) (finding it improper for the Appeals Council to discredit the Plaintiff's IQ scores); see also Castillo v. Barnhart, No. 00 CIV. 4343, 2002 WL 31255158, at *14 n.6 (S.D.N.Y. Oct. 8, 2002) ("However, most courts assume that a valid IQ result in the numerical range satisfies the first prong of 12.05C, and no additional inquiry is appropriate."); Coogan v. Astrue, No. 08-1387, 2009 WL 512442, at *5 n.1, *6 n.2 (D.N.J. Feb. 27, 2009) (stating that an ALJ may not decide which of multiple IQ scores he prefers because the regulations only require one score in the range of 60 through 70); accord Ray v. Chater, 934 F. Supp. 347, 350 (N.D. Cal. 1996) (inferring from the regulation's preference for the lowest score amongst the verbal, performance, and full scale scores, that the regulations prefer the lowest score amongst multiple tests).

In this case, the Court need not resolve these questions. Even assuming arguendo that the ALJ was required to accept Plaintiff's 1999 IQ scores as valid and erred by rejecting those scores in favor of the 2005 scores, Plaintiff would still have to satisfy the remaining criteria of Listing 12.05 (C). Sullivan v. Zebley, 493 U.S. 521, 529-30 (1990) (requiring a claimant show he meets all the criteria of a Listed impairment).

The ALJ concluded that, notwithstanding the IQ scores, Plaintiff did not meet the second prong of Listing 12.05 (C). (R. at 18). For the reasons stated below, because that conclusion is supported by substantial evidence, a remand is not required with

13

regard to whether and how the ALJ was to reconcile the varying IQ scores. Even if those scores were reconciled in favor of the Plaintiff, he would still be unable to satisfy Listing 12.05 (C).

> **b. Even if Plaintiff's 1999 IQ Scores Met the First Prong of Listing 12.05(C), the ALJ's Failure to Explain Rejecting Them Was Harmless Error**

The crux of Plaintiff's IQ argument is that considering his 1999 scores he meets Listing 12.05(C). Assuming *arguendo* that the ALJ found Plaintiff's 1999 IQ scores controlling, Plaintiff would still have to satisfy the remaining criteria of Listing 12.05(C). As the Supreme Court has said, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Sullivan</u>, 493 U.S. at 529-30; <u>see also</u> 20 C.F.R. §§ 404.1525(c)(3); 416.925(c)(3) ("[The Commissioner] will find that [a claimant's] impairment(s) meets the requirements of a listing *when it satisfies all of the criteria of that listing*, including any relevant criteria in the introduction, and meets the duration requirement.") (emphasis supplied).

In this case, the ALJ found that Plaintiff did not meet the diagnostic description or the second prong of Listing 12.05(C).[8] She reasoned:

> While sub[-]average intelligence has been demonstrated, the claimant's adaptive functioning is not consistent with disability based on mental retardation; as noted earlier, he is and has been able to hold a job, perform a wide variety of routine daily activities, drive, and behave in a socially appropriate manner. Thus the criteria set forth in the preamble to the listing that would suggest that further inquiry into whether the listing has been met or equaled have not been demonstrated.

_____

[8] Plaintiff has objected to the ALJ's findings with respect to the second prong, <u>see infra</u> Part III.B.2.c, but not her conclusion that Plaintiff lacks the requisite deficits in adaptive functioning. Plaintiff's Brief, p. 3.

Even so, the undersigned has considered Counsel's argument that Listing 12.05C is met due to evidence of a valid verbal, performance, or full scale I.Q. of 60 through 70. The IQ scores the claimant received when tested by Dr. Noia in July 2005 were all above 70, and Dr. Noia regarded these scores as valid and reliable estimate of the claimant's functioning (Exhibit 3F). There is no provision in the regulations for averaging IQ test results from different years, as urged by the claimant's representative (Exhibit 11E).

However, the requirement that there be another physical or other mental impairment imposing an additional and significant work-related limitation of function has not been shown. As previously discussed, the claimant has no other "severe" physical or mental impairment. In sum, the claimant does not meet or medically equal any listing in Appendix 1, including listing 12.05C. There is no ambiguity regarding this issue that would require the services of a medical expert.

(R. at 18).

Because the Plaintiff does not meet or equal the remaining criteria, the Court will not recommend remand for consideration of whether Plaintiff's 1999 IQ scores meet the first prong. See Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) ("Where application of the correct legal standard could lead only to one conclusions, [the Court] need not remand.") (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)); see, e.g., Miles v. Barnhart, 2008 WL 5191589, at *7 (N.D.N.Y. Dec. 8, 2008) (finding a failure to consider a criterion of a Listing harmless error where "application of the correct legal standard leads inexorably to a single conclusion: Plaintiff does not meet the criteria of [a] Listing.").

### c. Substantial Evidence Supports the ALJ's Conclusions that Plaintiff's (i) Seizure Disorder and (ii) Depression Were Not Severe Impairments and that (iii) Plaintiff Does Not Meet the Second Prong of Listing 12.05(C)

Plaintiff asserts that his seizure disorder and depression were "severe conditions in this case." Plaintiff's Brief, p. 3.The Court assumes that Plaintiff is arguing that the

15

ALJ's conclusions that his seizures and depression were not severe were flawed by legal error and unsupported by substantial evidence.

### i. Substantial Evidence Supports the ALJ's Conclusion that Plaintiff's Seizure Disorder Was Not Severe

An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). "[B]asic work activities" are the "abilities and aptitudes necessary to do most jobs," examples of which include, "walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; . . . seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [using] judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); see also S.S.R. 85-28, 1985 WL 56856, at *3-4.

In this case the ALJ found, "[t]he claimant has a history of seizure disorder, but this disorder has been under control with treatment and is therefore not a "severe" impairment" (R. at 16). The ALJ noted that the Plaintiff had not had a seizure in the past seven years. Id. The ALJ considered the opinion of consultative examiner, Jacqueline Parkin, M.D., that "[g]iven his history of seizure disorder, however, claimant should avoid heights, driving, and operating machinery." Id.; (R. at 143). The ALJ rejected these limitations because Plaintiff's treating physician had given Plaintiff permission to drive, Plaintiff had successfully obtained a driver's license, and Plaintiff regularly drove his family members around, functioning as their "taxi service" (R. at 17). The ALJ considered Plaintiff's testimony that his seizure disorder caused "twitching" once or twice daily, lasting for "a minute or two" (R. at 19, 20, 258). The ALJ reasoned that

16

"[e]ven if the twitching episodes described by the claimant were verified, which they were not, they are so minor and brief that they would not impose significant limitations on his functioning" (R. at 20). The ALJ concluded:

> The controlled seizure disorder has had no impact whatsoever on the claimant's ability to perform substantial gainful activity as a cemetery caretaker or at the newspaper and has had no impact on his ability to perform other work. There is no evidence that he has lost a job or had any limitations at a job due to the condition. Therefore it is concluded that at the very most, the controlled seizure disorder would have only the most minimal effect on his ability to work and is therefore not a severe impairment.

(R. at 17).

First, the Court notes that the ALJ improperly relied upon Plaintiff's past work experience in finding his seizure disorder not severe. At step two of the sequential evaluation, an ALJ "will not consider [a claimant's] age, education, and work experience." 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Bowen v. Yuckert, 482 U.S. 137 (1987) (upholding the regulations requiring a claimant to show a severe impairment based on medical evidence alone). However, the ALJ also assessed the medical evidence.

Based upon a careful review of the record and the ALJ's analysis of the medical evidence, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's seizure disorder was not a severe impairment. As the ALJ noted, Plaintiff's seizure disorder "has been under control with treatment" (R. at 16). There is no dispute that Plaintiff has not had a seizure for many years—since sometime between

1999 and 2001 (R. at 121, 132, 140, 257).[9] The record shows Plaintiff was on Tegretol

as early as 1999 (R. at 234) and continued to take 200 mg of Tegretol daily to treat his

seizure disorder (R. at 130-33, 135-37, 139). By all indications, Plaintiff's treatment

successfully prevents seizures. Plaintiff's treating physician, Dr. Rekha  Dharmapuri,

carefully assessed Plaintiff's seizure disorder on July 28, 2004, when Plaintiff

"request[ed a] physician's statements to obtain driver's permit" (R. at 132). At that time,

Dr. Dharmapuri conducted a physical examination, reviewed Plaintiff's family and

medical history of seizures, reviewed a CT scan of Plaintiff's head, and tested Plaintiff's

blood (R. at 132-37). Dr. Dharmapuri noted that Plaintiff's last seizure was three years

prior (R. at 132), that a 2003 CT scan was normal (R. at 133, 138), and that his Tegretol

levels were in the required range (R. at 137). Based upon his review, Dr. Dharmapuri

signed Plaintiff's driver's permit form (R. at 137) and the record indicates Plaintiff has

been driving on a regular basis  since then (R. at 95) (indicating Plaintiff's daily activities

included driving his Uncle to work and his cousin to school in the mornings and picking

them up in the afternoons).

Plaintiff relies on the opinion of consultative examiner, Dr. Parkin, to argue that

his seizure disorder is in fact a severe impairment. Plaintiff's Brief, p. 3. The ALJ did not

adopt Dr. Parkin's opinions that Plaintiff's seizure disorder prevented him from driving

(R. at 17). The evidence, particularly the review by Dr. Dharmapuri, supports the ALJ's

rejection of Dr. Parkin's opinion. Furthermore, the Court notes that Dr. Parkin performed

a physical examination of Plaintiff on July 7, 2005, but she neither ordered nor

---

[9] Plaintiff told the disability analyst his last seizure was in 2001 (R. at 121); told Dr. Dharmapuri it was 2001 (R. at 132); told the consultative examining physician it was 2000 (R. at 140); and told the ALJ it was 1999 to 2000 (R. at 257).

conducted any diagnostic techniques intended to assess Plaintiff's seizure disorder (R. at 140-44). This further supports the ALJ's reliance on the conclusions of Dr. Dharmapuri over those of Dr. Parkin. The Plaintiff also notes that Dr. Parkin's opinion as to Plaintiff's limitations were adopted in a "physical review technique." Plaintiff's Brief, p. 3. The Court notes that the form Plaintiff refers to was completed by the Social Security disability analyst. Therefore the ALJ was not required to assign weight to the opinion, nor should the ALJ prefer such an opinion over Plaintiff's treating physician. Finally, the Court notes to the extent the ALJ did not explicitly reject Dr. Parkin's opinions that Plaintiff should avoid heights and operating machinery, these limitations did not make Plaintiff's seizure disorder a severe impairment because neither are "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).

Therefore, based upon the medical evidence of record, the Court concludes that the ALJ's conclusion that Plaintiff's seizure disorder was not a severe impairment is supported by substantial evidence.

### ii. Substantial Evidence Supports the ALJ's Conclusion that Plaintiff's Depression Was Not a Severe Impairment

The Commissioner has established a "special technique" for determining whether a mental impairment is severe at step two. Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a). The technique first requires a determination of whether the Plaintiff has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Then, the ALJ must rate the degree of Plaintiff's functional limitation resulting from the impairment in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation.[10] § 404.1520a(c)(3). "[T]he written decision must incorporate the pertinent findings and conclusions based on the technique." § 404.1520a(e)(2).

In this case, the ALJ stated:

> In recent months, the claimant has sought mental health treatment for complaints of auditory hallucinations and depression (Exhibits 8F, 12F, and 13F). However, a mental health therapist noted that the claimant was unable to provide specific details regarding his alleged auditory hallucinations and appeared to be selective with information. This therapist also noted that the claimant would rather be on SSI than work (Exhibit 8F, page 3). The claimant's therapist raised the issue of malingering in a subsequent treatment note (Exhibit 8F, page 4). Notes from July 2006 state that working has actually alleviated some of the claimant's depression (Exhibit 12F, page 3). A mental health discharge summary from September 2006 states that the claimant believed that he would not have to work if he came to the mental health clinic (Exhibit 13F, page 2). In light of this evidence, which casts significant doubt on the validity of the claimant's reported psychiatric difficulties, the undersigned concludes that the claimant has not established a medically "severe" psychiatric impairment based on hallucinations or depression.

(R. at 17).

On September 23, 2005, Plaintiff sought mental health treatment for the first time (R. at 201-03). Sarah Miles, licensed social worker, performed Plaintiff's initial mental assessment and conducted his subsequent therapy sessions (R. at 179-84, 201-13). During his initial assessment, Plaintiff stated he was unsure if he wanted to work (R. at 202). Plaintiff complained of hearing voices for the past three to four years that commanded him to hurt himself or others (R. at 201). However, at Plaintiff's first therapy session with Ms. Miles, she noted although he continued to report auditory

---

[10] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." Kohler, 546 F.3d at 266 n.5 (quoting United States Social Security Administration, Disability Evaluation Under Social Security § 12.00 (June 2006)).

hallucinations, he was "only able to come up w[ith] [the] same examples that were given in history app[ointment]" (R. at 181). Ms. Miles characterized Plaintiff as "selective with information" (R. at 207). She noted that Plaintiff was "[u]pset that he must find appropriate work through Welfare to Work. He reports not wanting to work [because] of depression, however he notices [mental health] symptoms decrease when he is busy." Id. Ms. Miles observed "possible malingering" and "poor eye contact." Id. By Plaintiff's second therapy appointment with Ms. Miles, Plaintiff admitted that he did not so much hear voices as react to stress (R. at 181). At Plaintiff's third therapy appointment, Plaintiff denied hearing voices and complained of being "bored during the day" (R. at 209). Plaintiff described staying up all night watching movies, playing video games or cards. Id. Ms. Miles observed that he "really [was] not interested in working but [she was] trying to get him to look at future goals." Id. Ms. Miles continued to treat Plaintiff on a monthly basis, until Plaintiff was discharged on September 22, 2006 for failure to respond to the Clinic's attempts to contact him (R. at 201-13). Plaintiff never again complained of auditory hallucinations. At his initial assessment, Plaintiff had also complained of depression, which he attributed to the loss of his father (R. at 201). On July 19, 2006, Ms. Miles noted that "working has alleviated some of [Plaintiff's] depression, even if he does not recognize it. He works hard . . . and is able to take pride in his work" (R. at 206). In an assessment dated September 6, 2006, Ms. Miles noted that Plaintiff was "handling stress much better" and "no longer discusses the loss of his father" (R. at 205). Ms. Miles observed that "working increases his pride and dignity." Id. Notably, Ms. Miles never diagnosed Plaintiff with depression or auditory hallucinations.

On July 21, 2005, consultative examining psychologsist, Dennis M. Noia, Ph.D.

21

conducted a psychiatric evaluation of Plaintiff (R. at 150-53). Dr. Noia noted that Plaintiff did not report "any significant depressive, manic or anxiety related symptoms, or symptoms of a formal thought disorder or cognitive dysfunction" (R. at 151). However, Plaintiff did report that "[h]e sometimes feels a little depressed when he thinks about his father's death in April 2005." Id. After a mental examination, Dr. Noia concluded, "[v]ocational difficulties appear to be primarily caused by cognitive deficits and medical problems" (R. at 153). Notably, Dr. Noia did not diagnose Plaintiff with either depression or auditory hallucinations. Id. Instead, he diagnosed Plaintiff with "borderline intellectual functioning." Id.

On January 11, 2006, non-examining review psychologist, Dr. Thomas Harding, Ph.D., reviewed Plaintiff's records and assessed his allegations of depression and auditory hallucinations (R. at 185). Dr. Harding opined, "Essentially, the impression provided by [the evidence] is that of a young man with modest intellectual resources, limited motivation to work, but no clear psychopathology."

In her decision, although the ALJ did not use the precise phrase, "medically determinable mental impairments," based upon her decision, the Court concludes that the ALJ applied the first step of the special technique and found Plaintiff's alleged depression and auditory hallucinations were not "medically determinable mental impairments." Because she found Plaintiff's alleged depression and hallucinations not medically determinable impairments, the ALJ was not required to assess "the degree of functional limitation resulting from the impairments." See 20 C.F.R. § 404.1520a(b)(1)-(2) ("[The ALJ] must *first* evaluate [a claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable

22

mental impairment[]. . . . [the ALJ] must *then* rate the degree of functional limitation . . .")
(emphasis supplied).

Based upon a careful review of the record, the Court concludes that the ALJ's
finding is supported by substantial evidence. No medical professional who assessed
Plaintiff's mental impairments diagnosed him with depression or auditory hallucinations.
Instead, the record, as discussed above, strongly suggests that Plaintiff manufactured
these complaints.

Based upon the evidence in this case, the Court concludes that substantial
evidence supports the ALJ's conclusion that Plaintiff's alleged depression and auditory
hallucinations were not medically determinable impairments.

### iii.   Substantial Evidence Supports the ALJ's Conclusions that Plaintiff Did Not Meet the Second Prong on Listing 12.05(C)

Plaintiff argues that because his seizure disorder and depression were severe,
he met the second prong of Listing 12.05(C). Plaintiff's Brief, p. 3.

As previously stated, a claimant "must meet *all* of the specified medical criteria"
to meet a listing. Sullivan, 493 U.S. at 529-30. In this case, Plaintiff must meet the
second prong of Listing 12.05(C), which requires "a physical or other mental impairment
imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt.
404, Subpt. P, App. 1 § 12.05(C). Appendix 1 directs an ALJ to "assess the degree of
functional limitation the additional impairment[] imposes to determine if it significantly
limits [the claimant's] physical or mental ability to do basic work activities, i.e., is a
"severe" impairment[], as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. Pt. 404,
Subpt. P, App. 1, § 12.00(A). Thus, the regulations indicate that the proper test for

23

evaluating the second prong of Listing 12.05(C) is whether the impairment would be considered severe at step two of the analysis. See 20 C.F.R. §§ 404.1520(c), 416.920(c); accord Baneky v. Apfel, 997 F. Supp. 543, 546 (S.D.N.Y. 1998) ("This Court holds that the correct standard for determining whether an "additional" impairment imposes a "significant" work-related limitation under section 12.05(c) is the severity test . . .").

Here, the ALJ concluded that neither Plaintiff's seizure disorder nor his depression were severe impairments (R. at 16-18). As discussed above, the ALJ's findings were supported by substantial evidence. Moreover, no other impairments are alleged by Plaintiff, or indicated by the record, that would otherwise satisfy this requirement. Based on these findings, the ALJ concluded: "However, the requirement that there be another physical or other mental impairment imposing an additional and significant work-related limitation of function has not been shown. As previously discussed, the claimant has no other "severe" physical or mental impairment" (R. at 18). Because Plaintiff lacks another severe impairment, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff does not satisfy the second prong. Thus, Plaintiff cannot establish that his impairment meets Listing 12.05(C).

### d.  Substantial Evidence Supports the ALJ's Conclusion that Plaintiff's Impairments Do Not *Equal* Listing 12.05(C)

Finally, Plaintiff argues that the ALJ was required to determine if Plaintiff's condition equaled Listing 12.05(C). Plaintiff's Brief, pp. 3-4. Plaintiff argues that "POMS"

"[Program Operations Manual Systems][11] DI 24515.056(D)(1) provides that ALJ

commits error in failing to consider whether Claimant's mental retardation was medically

equivalent to list 12.05(c) when there are scores under 75." Plaintiff's Brief, p. 4. Plaintiff

is referring to the following language from the POMS:

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS DI 24515.056(D)(1)(c).

Defendant argues that the POMS are not binding on the Social Security Administration,

but even if they were, the ALJ specifically found that Plaintiff's impairments did not

equal any listing. Defendant's Brief, p. 8.

As Defendant correctly argues, "the POMS guidelines have no legal force  . . .

they do not bind the Commissioner . . ." Tejada v. Apfel, 167 F.3d 770, 775 (2d Cir.

1999) (quoting Schweiker v. Hansen, 450 U.S. 785, 789 (1981)). Thus, failing to apply

the POMS is not legal error. However, POMS guidelines "represent the Commissioner's

interpretation of the statutory mandate . . . deserve substantial deference, and will not

be disturbed as long as they are reasonable and consistent with the statute." Bubnis v.

Apfel, 150 F.3d 177, 180 (2d Cir. 1998); see Frerks by Frerks v. Shalala, 848 F. Supp.

---

[11] The Program Operations Manual System ("POMS") are "the publicly available operating instructions for processing Social Security claims." Washington State Dept. of Social & Health Servs. v. Guardianship Estate of Keffeler , 537 U.S. 371, 385 (2003).

340, 350 (E.D.N.Y. 1994) ("Although the POMS is not published in the Federal Register, and does not have the force of law, it is entitled to persuasive authority."). Therefore, the Court has carefully considered Plaintiff's argument. The Court also notes that medical equivalence is addressed by the regulations.

Under the regulations, an impairment "is medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). If a Plaintiff lacks "one or more of the findings specified" or "exhibit[s] all of the findings" but not at the specified severity, then his impairments will be found medically equivalent if "other findings related to [his] impairment . . . are at least of equal medical significance to the required criteria." 20 C.F.R. §§ 404.1526(b)(1)(i)-(ii). Thus, a Plaintiff may meet a Listed impairment with medical evidence other than that specified, but he must still show that his impairments at least equal all the specified criteria. The Supreme Court has explained: "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Sullivan, 493 U.S. at 531.

In this case, the ALJ considered whether Plaintiff's impairment was equivalent and rejected the possibility. She concluded, "[i]n sum, the claimant does not meet or medically equal any listing in Appendix 1, including listing 12.05C There is no ambiguity regarding this issue that would require the services of a medical expert" (R. at 18). Based upon the language cited by Plaintiff, the Court assumes that Plaintiff is arguing that his low score of 72 on the 2005 IQ test was equivalent to the first prong of Listing

26

12.05(C). Assuming *arguendo* that Plaintiff's 2005 IQ scores in fact equals the first prong of Listing 12.05(C), Plaintiff has not alleged, nor does the record show, that any combination of Plaintiff's impairments can equal the diagnostic description and the second prong of the Listing. Thus, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments do not equal Listing 12.05(C).

### IV.    Conclusion

Based on the foregoing, the Court recommends that Plaintiff's motion for judgment on the pleadings should be DENIED and Defendant's motion for judgment on the pleadings should be GRANTED.

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

DATED: July 29, 2009

Syracuse, New York

### Orders

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of

27

Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir.1988).

**SO ORDERED**.

DATED: July 29, 2009

Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge

28